**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| SHARON WADE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:10-CV-1237 CAS |
| ) | |
| AETNA LIFE INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

<u>**AMENDED MEMORANDUM AND ORDER**</u>

This matter is before the Court on cross-motions for summary judgment filed by plaintiff

Sharon Wade and defendant Aetna Life Insurance Company ("Aetna"). Plaintiff filed this action

challenging the termination of her long-term disability benefits under the welfare benefit plan of her

former employer, Quest Diagnostics, Inc. ("Quest"). The plan is governed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, <u>et seq.</u> The motions are

fully briefed and ready for decision. For the following reasons, the Court will grant Aetna's motion

for summary judgment and deny plaintiff's motion for summary judgment.

**I. Summary Judgment Standard**

The Eighth Circuit Court of Appeals recently restated the applicable standards relating to

summary judgment as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials
> on file, and any affidavits show that there is no genuine issue as to any material fact
> and that the movant is entitled to judgment as a matter of law. The movant bears the
> initial responsibility of informing the district court of the basis for its motion, and
> must identify those portions of the record which it believes demonstrate the absence
> of a genuine issue of material fact. If the movant does so, the nonmovant must
> respond by submitting evidentiary materials that set out specific facts showing that
> there is a genuine issue for trial. On a motion for summary judgment, facts must be
> viewed in the light most favorable to the nonmoving party only if there is a genuine
> dispute as to those facts. Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted).

The Eighth Circuit also recently explained what the nonmoving party must do to meet its obligation to show that disputed facts are material:

In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying "facts that might affect the outcome of the suit." Anderson [v. Liberty Lobby, Inc.], 477 U.S. [242] at 248 [(1986)]. The nonmoving party must then categorize the factual disputes in relation to the legal elements of her claim. Id.; Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006).

Quinn v. St. Louis County, __ F.3d __, No. 10-3332, 2011WL 3890319, at *3 (8th Cir. Sept. 6, 2011). Thus, to survive a motion for summary judgment, the nonmoving party must "explain the legal significance of her factual allegations beyond mere conclusory statements importing the appropriate terms of art," and provide a "meaningful legal analysis explaining how, under the applicable law, the disputed facts might prove [her] . . . claim at trial." Id. at *4 (internal citations omitted).

Where parties file cross-motions for summary judgment, as here, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. See, e.g., Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983). The denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944).

**II. Facts**

I.

As a threshold matter, Local Rule 4.01(E) provides with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 4.01(E).

The "concision and specificity required" by rules such as Local Rule 4.01(E) "seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge." Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) (cited case omitted). This type of local rule "exists to prevent a district court from engaging in the proverbial search for a needle in the haystack. Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." Id. (internal quotation and citation omitted).

Approximately twenty-five of plaintiff's seventy-seven numbered paragraphs in response to defendant's statement of uncontroverted material facts consist of statements such as the following: "Plaintiff objects and moves to strike ¶ 4 in that this fact is in controversy. The documents noted in ¶ 4 were not included in the administrative record produced by Defendant to the court under seal." Pl.'s Resp. to Aetna's Statement of Uncontroverted Material Facts at 1. "Plaintiff objects and moves

3

to strike ¶ 20 in that this fact is in controversy." Id. at 3. "Plaintiff moves to strike ¶ 43 as to any opinions regarding 'moderately active,' which is not defined, and that the report 'did not indicate that Plaintiff had difficulty,' as these are facts in controversy." Id. at 5. "Plaintiff agrees that Defendant Aetna terminated Plaintiff's LTD benefits on October 1, 2007 and moves to strike ¶ 54 as patently false and in controversy." Id. at 7. "Plaintiff moves to strike ¶ 73 as incomplete and inaccurate depictions of Plaintiff's ability and offers no substantiation of Plaintiff's abilities or capabilities." Id. at 10.

These specific responses by plaintiff, and the similar responses, fail to comply with Local Rule because they do not provide specific references to portions of the record upon which plaintiff relies or otherwise provide specific facts, as opposed to conclusory statements, to show that a material controversy exists. The Court therefore deems admitted defendant's statements of uncontroverted material fact to which no proper response was made.

## II.

Plaintiff was employed as a phlebotomist and later as a customer service representative for Quest until May 4, 2001. As of May 4, 2001, plaintiff was no longer able to work due to constant headaches, visual disturbances, dizziness, fatigue, and other symptoms. On July 31, 2001, plaintiff underwent a craniotomy for an anterior pituitary gland tumor.

Plaintiff filed for short-term and long-term disability ("LTD") benefits due to headaches, the anterior pituitary gland tumor, visual disturbances, and fatigue. Plaintiff began receiving short-term disability benefits in April 2001. On November 9, 2001, Aetna initially approved plaintiff's LTD benefits effective May 4, 2001. Plaintiff underwent additional surgery approximately one year after the first surgery. Plaintiff continued to receive LTD benefits until October 1, 2007, when Aetna determined that she was no longer "disabled" under the policy and terminated her benefits.

Plaintiff was a non-exempt employee. The managed disability coverage provided by Quest for its employees involved (1) a group policy, (2) an associated Booklet, and (3) an associated Summary of Coverage. Plaintiff's status as an exempt or non-exempt employee simply confirms which Booklet and Summary of Coverage pertain to her and does not affect the merits of the summary judgment analysis.

## A. The Policies

### 1. The Policy in Effect in 2001

The Aetna group insurance policy providing for managed disability benefits through plaintiff's employer as of May 4, 2001, is policy number GP-654275, issued May 28, 1989, effective September 1, 1986, which is labeled AETNA1949-1970 (the "1986 Policy").[1] Changes in the employer's name, from Met Path, Inc., to Quest Diagnostics Incorporated, are reflected in the Riders labeled AETNA1971-1972.

The 1986 Policy provides that the insurance in force is set forth in the certificates issued in connection with that policy. See AETNA1962. The certificate pertaining to plaintiff's managed disability benefits in 2001 consists of the Booklet labeled AETNA1766-1788. See also AETNA1767 ("To the extent that the provisions of this Booklet relate to the part of the Plan underwritten by Aetna, they will become your Certificate of Insurance . . . ."). The Summary of Coverage that was in effect in 2001 was issued October 1, 1999, effective January 1, 2000, and

---

[1]All references labeled "AETNA" followed by a specific bates number are to the Administrative Record which Aetna filed under seal (Docs. 17-39); the 2005 Policy materials filed with Aetna's Surreply in Support of its Motion for Summary Judgment (Doc. 70); and the 1986 Policy materials filed as attachments to the Minoski Declaration, Ex. 2 to Aetna's Statement of Uncontroverted Material Facts (Doc. 80).

labeled AETNA1722-1727. The Booklet and Summary of Coverage that were in effect at the time plaintiff first submitted her disability claim in 2001 remained in effect until January 1, 2005.

The Booklet in effect from 2001 through 2004 states, "A period of disability will be certified by Aetna if, and for only as long as, Aetna determines that you are disabled . . . ." AETNA1768. This Booklet states that after the first 30 months of her disability, plaintiff would continue to be considered disabled only "while" she was "not able, solely because of disease or **injury**, to work at any **reasonable occupation**." AETNA1768 (emphasis in original).

The Booklet in effect from 2001 through 2004 defines "Reasonable Occupation" as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience." AETNA1787. The same Booklet provides that a "certified period of disability" ends on the first to occur of, among other things, "[t]he date certification of the period of disability by Aetna ends, and the period of disability is not recertified by Aetna," or "[t]he date you cease to be disabled[,]" or "[t]he date an independent medical exam report, when required, fails to confirm your disability." AETNA1771.

Aetna and Quest could change or terminate the 1986 Policy at any time without the consent of Quest's employees. See AETNA1962, 1970. The Booklet in effect from 2001 through 2004 provided that "as with all group plans, this Plan may be changed or discontinued with respect to all or any class of employees." AETNA1782.

### 2. The Policy In Effect In 2004

Aetna restated the 1986 Policy in its entirety, effective as of July 1, 2004, giving it the new policy number GP-699840 (Connecticut) (the "2004 Policy"). See AETNA1728-1765.

Aetna and Quest could change or terminate the 2004 Policy at any time without the consent of Quest's employees. See AETNA1744, 1760-62. As stated above, the Summary of Coverage and

6

the Booklet in effect throughout 2004 were the same Summary of Coverage and Booklet that were in effect in 2001.

     3. <u>The Policy In Effect 2005 - 2008 – Through the Benefits Termination and Appeal</u>

Aetna rewrote the 2004 Policy effective January 1, 2005 (the "2005 Policy"). A copy of the 2005 Policy and its Rider are labeled as AETNA1895-1948.

The 2005 Policy provides that the insurance in force is set forth in the certificates issued in connection with that policy. <u>See</u> AETNA1962. The 2005 Policy also provides for the issuance of a new Summary of Coverage and a new Booklet, both effective January 1, 2005.

The certificate pertaining to plaintiff's managed disability benefits beginning January 1, 2005, consists of the Booklet labeled AETNA1874-1894 (the "2005 Booklet"). <u>See also</u> AETNA1875 ("To the extent that the provision of this Booklet relate to the part of the Plan underwritten by Aetna, they will become your Certificate of Insurance . . . .").

A copy of the Summary of Coverage that was in effect beginning January 1, 2005 is labeled AETNA1863 through AETNA1873 (the "2005 Summary of Coverage"). The 2005 Policy, the 2005 Summary of Coverage, and the 2005 Booklet remained in effect through 2009, past the period involving the Aetna decisions under review in this case.

The 2005 Booklet states, "A period of disability will be certified by Aetna if, and for only as long as, Aetna determines that you are disabled . . . ." <u>See</u> AETNA1876. The 2005 Booklet also states that after the first 30 months of her disability, plaintiff would continue to be considered disabled only "while" she was "not able, solely because of disease or **injury**, to work at any **reasonable occupation**." AETNA1876 (emphasis in original). The 2005 Booklet defines "Reasonable Occupation" as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience." AETNA1892.

The 2005 Booklet provides that a "certified period of disability" ends on the first to occur of, among other things, "[t]he date certification of the period of disability by Aetna ends, and the period of disability is not recertified by Aetna," or "[t]he date you cease to be disabled[,]" or "[t]he date an independent medical exam report, when required, fails to confirm your disability." AETNA1879. The last period of disability that Aetna certified for plaintiff ended on July 31, 2007. AETNA1818-1819.

Aetna and Quest could change or terminate the 2005 Policy at any time without the consent of Quest's employees. See AETNA1932, 1945. The 2005 Booklet provided that "as with all group plans, this Plan may be changed or discontinued with respect to all or any class of employees." AETNA1889.

### 4. Plaintiff's Request for the Policy

In December 2009, plaintiff's former attorney, Mr. Jack F. Allen, wrote Aetna a letter requesting the disability policy documents. By letter dated January 14, 2010, Aetna Appeal Specialist Carole Roy responded to this request by sending Mr. Allen two copies of a Booklet (one that pertained to plaintiff as a non-exempt employee and one that did not) and two copies of a Summary of Coverage (one that pertained to plaintiff as an non-exempt employee and one that did not), all of which had effective dates of January 1, 2000. See Docs. 69-1 through 69-4. Aetna did not send plaintiff's attorney a copy of the actual group insurance policy, as he had requested.

### B. **Discretionary Language**

The 1986 Policy did not contain express language granting Aetna discretionary authority to determine to what extent employees and beneficiaries are entitled to benefits, or to construe any disputed or doubtful terms of the policy.

Under the 2004 Policy, "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy."  AETNA1764.

Under the 2005 Policy, "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy."  AETNA1948.

### C.  Plaintiff's Claim History

On November 9, 2001, Aetna approved plaintiff's disability claim with benefits beginning May 4, 2001.  AETNA766-769.  Thereafter Aetna periodically reviewed plaintiff's claim while continuing to pay her benefits under the policy.  AETNA467-565.

On August 28, 2003, plaintiff was visited by Christy Freeman, an Aetna vendor who determined that plaintiff's reports of pain and dysfunction were legitimate and that plaintiff was not capable of returning to work in any capacity at that time.

On November 14, 2003, plaintiff was reported to be seeing Dr. Jawed Siddiqui and was being treated for mitral valve prolapse, asthma, GERD, arthritis and anemia.  On November 14, 2003, records from Dr. Safi, plaintiff's ophthalmologist, were faxed to Aetna, indicating moderate vision loss and plaintiff's need for glasses as a result of blurred vision.  Aetna records indicate that on November 18, 2003, plaintiff had left ventricular hypertrophy, small pericardial effusion, diastolic dysfunction of the left ventricle and thickened mitral leaflets per a cardiac Doppler test.

On November 15, 2004, plaintiff underwent an MRI of the brain which showed probable post-op sella with expanded but fluid-filled sella turcica.  No residual enhancing tissue was identified.  The pituitary stalk remained intact extending to the posterior inferior aspect of the sella, with mild central and cortical volume loss.

On April 5, 2005, plaintiff was seen in the Emergency Department of Christian Hospital Northeast for bronchitis with wheezing. On May 25, 2005, plaintiff was reported to have seen Dr. Siddiqui. She was taking two blood pressure medications at that time and continued to have headaches and fatigue. On June 6, 2005, plaintiff was reported to have had an echocardiogram showing left atrial enlargement, left ventricular hypertrophy and small pericardial effusion. A cardiac Doppler study showed mitral valve regurgitation and tricuspid valve regurgitation.

On July 25, 2005, plaintiff underwent an MRI of the brain which showed no significant changes since the previous study. On December 12, 2005, plaintiff reported continued problems with short term memory loss, fatigue and bilateral eye depth perception problems. On April 19, 2006, plaintiff reported memory loss, fatigue, bilateral eye depth perception, visual disturbances, chronic headaches, chronic sinus infection, chest discomfort and shortness of breath while walking up stairs.

On August 1, 2007, plaintiff treated with Dr. Oscar Hantz of Ear, Head and Neck Specialists for ear pain, sinusitis and rhinitis. On October 30, 2007, Plaintiff treated with Dr. Maheen Malik, a specialist in Neurology, who found moderate cognitive deficits.

On November 26, 2007, plaintiff underwent an MRI of the lumbar spine which showed sacralized L5 and mild disc bulge and facet degenerative arthropathy at L4-5. On November 30, 2007, plaintiff had x-rays of the spine and the right knee. The spine x-ray showed transitional L-5 vertebra, partially sacralized with a large left transverse process and pseudojoint formation with the superior portion of the sacrum. The right knee showed mild degenerative joint disease involving the patellofermoral joint space and the medial compartment.

In February and March of 2008, plaintiff received treatment for sacroillitis of the right sacroiliac joint in the form of injections into the joint by Gregory Stynowick, M.D., and plaintiff also attended physical therapy at Graham Medical Center Rehabilitation Services.

Plaintiff has treated with ophthalmologist Dr. Safi for vision disturbances following the brain tumor. Dr. Safi's impression is hyperopia and optic neuropathy, status post compression by pituitary tumor.

Plaintiff has treated with Dr. Samudrala, a rehabilitation physician, for complaints of back and knee pain. Plaintiff obtained physical therapy but "demonstrated poor attendance and poor compliance with the prescribed course of care" as she attended only two of seven scheduled appointments. AETNA 1302. Plaintiff was discharged from organized physical therapy in February 2008. Id.

Plaintiff has treated with Dr. Siddiqui since prior to 2001 and he has provided her cardiac and internal medicine care as well as obtaining consultants when necessary and various testing.

### D. Aetna's Monitoring of Plaintiff's Condition

In 2003 Aetna terminated plaintiff's disability benefits due to a lack of clinical support for her ongoing disability status, AETNA491-493, but after receiving further medical records, Aetna reconsidered that decision, overturned it, and recertified plaintiff's disability benefits. AETNA495. Aetna continued to collect updated medical records for plaintiff, recertifying her for additional periods of disability throughout 2003 and 2004. At that same time, Aetna advised plaintiff that it "must be able to obtain current objective medical at the end of each certification to determine current disability status and length of cert[ification] extension." AETNA512.

By June 2005, Aetna advised plaintiff that it had tried to discuss her status with Dr. Siddiqui to "get specific medical and functionality information to support severity of disability," but that Dr.

Siddiqui "provided functional limitations but he did not address the duration of the limitations[]" and that he would not respond to Aetna's inquiries as to whether plaintiff was "able to work any hours[.]" Id.

In October 2005, Aetna's medical director noted that he would call Dr. Siddiqui because the doctor had listed for plaintiff functional capabilities that were "consistent with sedentary to light work" but continued to indicate that plaintiff was "totally disabled." AETNA527. The medical director noted that he spoke with the doctor on October 13, 2005, at which time Dr. Siddiqui said plaintiff could work in a sedentary position and he would discuss that with her during her next office visit. Id. Aetna faxed Dr. Siddiqui a confirmation letter regarding plaintiff's ability to perform sedentary work the next day, see id. ("Confirmation letter faxed to Dr. Siddiqui"); AETNA810 (the letter). However, Dr. Siddiqui did not return the letter until December 2, 2005, and when he did, he wrote "[plaintiff] is disabled to work" on the letter with no further explanation. See AETNA810.

Dr. Siddiqui continued to submit form periodic reports to Aetna showing plaintiff's functional capabilities that were consistent with sedentary to light work, but indicating that plaintiff was "totally disabled." Although these forms stated, "If she is not able to work please provide your medical rationale," Dr. Siddiqui did not do so.

Aetna obtained updated medical records from Dr. Siddiqui's office in early 2007. Shortly thereafter, Aetna called plaintiff, discussed the status of her disability claim, and advised her that it was going to obtain peer review of her claim to "assist with the continued disability review." See AETNA 537. The peer reviewer concluded that the medical information and testing was inconsistent with the reported severity of plaintiff's limitations. See AETNA538. Shortly after that, Aetna arranged for video surveillance and an independent medical examination. See AETNA 538-42.

## E.  Surveillance of Plaintiff

Aetna conducted surveillance of plaintiff from May 10, 2007 through May 12, 2007.  A DVD containing a video copy of that surveillance is in the record at AETNA1862.[2]  The surveillance revealed that plaintiff did not appear to have difficulty: (1) entering and exiting her vehicle at her home and various stores, (2) driving, (3) walking, (4) bending, (5) carrying small bags of store-bought and other personal items to and from her vehicle, and (6) assisting a child into and out of a vehicle.

## F.  Plaintiff's IME

On July 19, 2007, Dr. John Gragnani conducted an independent medical examination ("IME") of plaintiff.  Dr. Gragnani also reviewed plaintiff's medical records from her treating physician, Dr. Siddiqui, records from a chiropractic clinic that treated plaintiff's back, EKG reports, laboratory reports, and a visual field chart.

Dr. Gragnani completed a functional capacity worksheet ("FCW") of plaintiff, in which he determined that she was able to occasionally crawl, kneel, lift, pull, push, reach above her shoulders, reach forward, carry, bend and twist, but could never climb.  Dr. Gragnani determined that plaintiff could frequently perform the following actions with both right and left hands: grasp, firm hand grasp, fine manipulation, gross manipulation, and repetitive motion; and that plaintiff could frequently sit.  Dr. Gragnani determined that plaintiff could occasionally stand, stoop and walk; that she could lift up to ten pounds frequently, and up to fifty pounds occasionally, but could not lift over fifty pounds.  Dr. Gragnani found that plaintiff could operate a motor vehicle but not a hazardous machine or power tools, and that she was limited in her vision and depth perception by needing appropriate

---

[2]The Court has viewed the DVD of plaintiff's surveillance.

eyeglasses. Dr. Gragnani determined that plaintiff could move her head and neck in static position, frequent flexing, and frequent rotation. He did not find any exposure limitations and concluded plaintiff could work an eight-hour day, and that her restrictions were permanent. AETNA854.

Dr. Gragnani noted in his report that: (1) "On examination, [plaintiff] is able to ambulate normally and uses no assistive device."; (2) "[Plaintiff] had pretty good peripheral vision with just a little decrease in the superior field."; and (3) "[Plaintiff's] ability to move, to get up on the exam stool and to get herself down was not impaired on observation at this time." AETNA859.

After reviewing plaintiff's past medical history, work history, and conducting a functional capacity evaluation and physical examination, Dr. Gragnani concluded that "[plaintiff] is capable of performing a sedentary job[,]" and that "[n]o specific accommodations are needed for [plaintiff] except that she needs a more sedentary occupation such as deskwork." AETNA860. Dr. Gragnani's recommendation for sedentary activity was based on his findings of pituitary tumor, fatigue, and cardiac abnormalities. AETNA861.

## G. Aetna's First Labor Market Analysis

As part of Aetna's review process, on or about September 10, 2007, Aetna's Vocational Rehabilitation Consultant ("VRC"): (1) Conducted a review of plaintiff's of work history and current abilities; (2) identified occupational matches based on plaintiff's work history and abilities; and (3) identified seven sedentary job openings that plaintiff could work given her physical and mental limitations. Each sedentary job identified by Aetna's VRC was within a 50-mile radius of plaintiff's home in St. Louis, Missouri, and offered wages that met or exceeded plaintiff's reasonable wage under the policy.

**H. Request for Treating Physician Response; Initial Benefits Termination Decision**

On September 14, 2007, Aetna sent plaintiff's treating physician, Dr. Siddiqui, a letter informing him that Aetna was assessing plaintiff's current medical condition, her level of functionality, and her ability to work in a reasonable occupation. AETNA878. The letter discussed and enclosed a copy of the surveillance report, Dr. Gragnani's IME, and the first labor market analysis. Aetna requested that Dr. Siddiqui's respond by October 1, 2007, to Aetna's preliminary determination that plaintiff had the ability to perform the duties of a sedentary occupation on a full-time basis by October 1, 2007. The letter asked that if Dr. Siddiqui disagreed with Aetna's assessment of plaintiff's condition and ability to work, he provide "a detailed medical narrative, to include a description/statement of the objective medical information/documentation you base your opinion on, as well as copies of any test results, examination results etc., you feel would help clarify your position." AETNA 880. The letter also stated:

> We consider your recommendation a vital part of this claim review and appreciate your time assisting us. In order for the review to be timely, as well as correct, **we ask that you respond by October 1, 2007**. If we do not receive your response by **October 1, 2007**, we will assume you agree with our assessment regarding Ms. Wade's ability to perform the duties of a sedentary occupation on a full-time basis.

Id. (emphasis in original). Dr. Siddiqui did not respond to Aetna's September 14, 2007 correspondence by October 1, 2007. Although plaintiff asserts that Dr. Siddiqui's staff notified Aetna his response would be delayed because of personnel issues, there is no support in the record for plaintiff's assertion. Moreover, it is undisputed that Dr. Siddiqui never responded to Aetna at any point after October 1, 2007.

Based on its assessment of plaintiff's medical condition, and with no response from Dr. Siddiqui, Aetna determined that plaintiff no longer met the definition of "disabled" (the inability to work in any reasonable occupation) under the policy. On October 1, 2007, Aetna terminated

plaintiff's LTD benefits on the basis that she failed to present sufficient evidence of any functional, physical or mental impairment, which would prevent her from working in a sedentary job on a full-time basis.

On or about November 30, 2011, Dr. Siddiqui faxed to plaintiff's former attorney a partially-completed form report of plaintiff's health conditions. AETNA1520-27. A significant portion of the form was left blank, but a notation was made that "Patient was referred to Dr. Maheen Malik . . . for the evaluation of Questions 22 thru 25." These questions concerned key aspects of plaintiff's functional capacity: plaintiff's ability to sit and stand continuously; whether she would need to walk during the work day; whether she would need a job that would permit her to shift positions or take unscheduled breaks; whether her legs would need to be elevated on prolonged sitting; whether she would need an assistive device for standing or walking; how many pounds she could lift; whether she had significant limitations in the use of her hands, fingers and arms; an estimate of how often her impairments would cause her to be absent from work; whether there were any other limitations that would affect plaintiff's ability to work at a regular job on a sustained basis (such as psychological limitations, limited vision, difficulty hearing, the need to avoid temperature extremes, humidity, noise, dust, fumes, gases, etc.); whether plaintiff's physical, psychological, and emotional impairments were reasonably consistent with the symptoms and functional limitations described in the rest of the report; and what activities plaintiff could do despite her various illnesses and medication side effects (including the ability to do such work-related activities as driving, sitting several hours, walking, lifting, carrying, hearing, speaking, traveling, capacity for understanding and memory, sustained concentration and persistence, social interaction and adaptation). AETNA 1524-27.

On February 25, 2008, Dr. Siddiqui sent a letter to plaintiff's former attorney, in response to a letter from the attorney which does not appear to be in the record. The body of Dr. Siddiqui's letter states in its entirety:

> Thank you for your letter about the medical condition of Ms. Sharon Wades [sic]. As you know, Ms. Sharon Wades [sic] has been under my care for the last several years. She has several medical problems including postoperative status of a pituitary tumor, which was resected a few years ago and she has been regularly followed by an opthalmologist to check her state of vision. the patient has been treated in my office for several other problems including the back pain, radiculopathy of L5-S1, abdominal pain and mitral valve regurgitation, diastolic dysfunction of the left ventricle also and treated for the arthritis of the lumbosacral spine, arthritis of the hip joint, and arthritis of the knee joint. She is also under treatment for metabolic syndrome. The patient has also been under treatment for dysthymic reaction. A few times in the past she had been treated for pericardial effusion. She also had a diagnosis of exertional fatigue. At the present time she is taking several medications. The list of her medications is quite long in her medical records. At the present time, the patient because of several medical conditions is unable to work. In my opinion she will not be able to do her present work because of various medical conditions. If you have further questions please do not hesitate to contact me. My fax number is 830-0756.

AETNA 1528.

## I. **Plaintiff's Appeal**

On or about April 9, 2008, plaintiff appealed from Aetna's termination of her LTD benefits. In her appeal, plaintiff argued that some of the findings upon which Aetna relied were incorrect and/or incomplete, including Dr. Gragnani's IME, plaintiff's medical records, and Aetna's surveillance report. Plaintiff also included in her appeal a fifteen-page letter from her former attorney, and over 500 pages of exhibits, most of which consisted of plaintiff's medical records. Many of these medical records were already part of Aetna's files.

On or about April 21, 2008, Aetna placed plaintiff's appeal on hold to allow her to supplement her medical records. On or about May 8, 2008, plaintiff supplemented her appeal with updated medical records, and Aetna began processing the appeal.

Based upon plaintiff's various medical conditions, Aetna had five independent board-certified consultants review a significant number of plaintiff's medical records, including her supplemental medical records, to offer their opinions.[3]

First, the cardiology consultant, Dr. Leonard Pianko, concluded that plaintiff was capable of sedentary physical activity from October 1, 2007 forward. Specifically, Dr. Pianko noted: (1) "There is no evidence of significant chest discomfort and pain, shortness of breath, or respiratory difficulty."; (2) "On peer-to-peer consultation with her cardiologist, Dr. Siddiqui, he feels that [plaintiff] can perform a sedentary job without any difficulty from 10/1/07 through present."; (3) "From a cardiac perspective, she has been stable with only mild mitral valve prolapse with minimal mitral regurgitation. There is a normal left ventricular systolic ejection fraction of 55%, no evidence of coronary artery disease, no evidence of congestive heart failure, no evidence of arrhythmia. She should be able to perform a sedentary job from 10/1/07 through the present without any difficulty." AETNA1618-19.

Second, the rehabilitation medicine consultant, Dr. Michael Goldman, concluded that plaintiff was capable of sedentary physical activity from October 1, 2007 forward. AETNA1623-1628. Dr. Goldman's report states that on June 19, 2008, he spoke with one of plaintiff's treating physicians, Dr. Samudrala, who also opined that plaintiff "should be capable of performing at least sedentary work as there are no specific neurologic or orthopedic impairments that would preclude at least sedentary exertion work." AETNA1627. Dr. Goldman concluded, "Based on the provided documentation and telephonic consultation, there are no functional impairments from 10/1/07 through the present that would preclude [plaintiff from] performing any occupation." AETNA1627.

---

[3]The documents reviewed by each specialist are listed at the beginning of their reports.

Third, the neurology consultant, Dr. Vaughn Cohan, concluded that plaintiff was capable of sedentary physical activity from October 1, 2007 forward. AETNA1629-1635. Regarding the medical opinions of Dr. Siddiqui, Dr. Cohan stated:

> Dr. Siddiqui has submitted several Attending Physician's Statements and Capabilities and Limitations Worksheets in which he states that he considers [plaintiff] to be disabled, but the physical capabilities described include pushing and lifting capabilities consistent with performance of at least sedentary work, and it is stated that [plaintiff] can occasionally climb, crawl, kneel, reach above shoulder level, bend, twist, reach forward, and use the hands for grasping and fine manipulations. Thus[,] the physical capabilities described would seem to be contradictory to Dr. Siddiqui's statement that he considers [plaintiff] to be permanently and totally disabled.

AETNA1632.

Dr. Cohan further stated, "it is my opinion that the documentation provided is insufficient for purposes of substantiating a functional impairment of work[,]" and "[t]he documentation would suggest that the claimant is limited to performing sedentary and/or light work." AETNA1634.

Fourth, the pulmonary consultant, Dr. Dennis Mazal, found that plaintiff was capable of sedentary physical activity from October 1, 2007 forward. AETNA1636-1641. Dr. Mazal stated, "Based upon the information reviewed and considered, there is no support for a loss of functionality that would preclude [plaintiff] from performing the duties of any occupation during the time period in question, 10/1/07 through the present date." AETNA1640.

Finally, the psychology consultant, Dr. Lawrence Burstein, found that plaintiff was capable of sedentary physical activity from October 1, 2007 forward. AETNA1642-1650. Dr. Burstein stated:

> [Plaintiff] would have difficulty at occupations requiring her to accurately draw and she would also likely have difficulty at tasks requiring strong mathematical and memory skills. However, [plaintiff's] mathematical and memory deficits could be accommodated through the ability to use a calculator and the ability to write things down.

. . . .

In my opinion, the above-noted impairments would not prevent an individual from performing many unskilled and semi-skilled labor type jobs.

AETNA1648.

### J.  **Aetna's Second Labor Market Analysis and Final Decision**

In light of the consulting physicians' reports, Aetna conducted a Labor Market Survey ("LMS") to determine whether, given the above findings regarding plaintiff's abilities, and plaintiff's education, experience, and training, plaintiff was capable of performing any occupations which were within her geographical area of St. Louis, Missouri (50-mile radius), and paid a reasonable wage.

The LMS revealed three sedentary occupations that plaintiff was capable of performing including cashier, ticket taker/seller, and information clerk/greeter.  AETNA1651.  Six of seven employers within the three sedentary occupations contacted in connection with the LMS stated that the positions were sedentary, repetitive occupations that fell within plaintiff's physical restrictions.  AETNA1656.  The employers also indicated that they had such positions that were either within, or could be modified to be within, plaintiff's physical capabilities.  AETNA1656.

On July 24, 2008, Aetna concluded that its prior decision denying plaintiff's LTD benefits effective October 1, 2007 under the policy was proper.  AETNA1609-1613.

### K.  **Aetna's Procedural Safeguards**

Aetna has established the following internal procedures to reduce potential bias and promote accuracy in its decision making:

1.  Employees who make decisions regarding the claims and appeal of plan participants are paid fixed salaries and bonuses, wholly unrelated to the number of claims paid or denied.

2. Aetna does not establish numerical guidelines or quotas regarding claims payments of denials.

3. Aetna employees are not evaluated on the basis of the number of claims paid or denied, but rather on whether the claims were handled correctly in accordance with the applicable plan documents.

4. Aetna maintains a separate appeal unit for the consideration of denied claims.

5. Employees in the appeal unit are charged with making an independent assessment of the claim decision based on all evidence in the claim file, and not simply a determination of whether the initial decision was reasonable. Appeal employees do not discuss the claim with the individual who made the initial benefits determination.

6. Neither the claims department nor the appeal unit has any role or responsibility in managing, reporting, or other functions regarding Aetna's finances.

7. Aetna's claims department and appeal unit are completely separate business units from its financial underwriters.

8. When making claims decisions, neither the claims department not appeal unit is required to seek approval from the financial underwriters.

9. Aetna's financial underwriters do not advise or influence the claim department or appeal until with respect to whether or not to pay a claim.

10. Neither the office of the Senior Executive Vice President/Chief Financial Officer and Chief Enterprise Risk Officer of Aetna, nor any of its direct reports, including the offices of the Vice President of Business Operations Finance and Vice President and Chief Investment Officer of Pension and Investment Management, have any involvement in claims decisions.

**III. ERISA Standard of Review**

Under ERISA, the standard of review of a denial of benefits claim turns on whether the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). Where the plan administrator has such discretionary authority, judicial review is limited to an abuse of discretion standard. <u>Id.</u>

Here, the 1986 Policy that was in effect when plaintiff was initially determined to be eligible for LTD benefits lacks any language granting the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. The policies issued in 2004 and 2005, however, clearly do confer such discretion on the plan administrator. The 2005 Policy, which was in effect when Aetna terminated plaintiff's benefits, states that "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy."

To determine which standard of review applies, the Court must first decide which version of the policy governs. The parties did not cite and the Court has not found in independent research any Eighth Circuit case addressing which policy dictates the standard of review when an insured files her claim and is awarded benefits under a non-discretionary policy, but those benefits are subsequently terminated under an amended policy that gives the plan's administrator discretionary authority to determine eligibility or construe the policy's terms.

The Ninth and Seventh Circuits have addressed this question, as has the United States District Court for the Southern District of Iowa, and these courts have held that in such a situation the second policy applies. Consistent with Eighth Circuit precedent, the courts noted that "an ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied."

22

Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1159 (9th Cir. 2001) (quoting Blessing v. Deere & Co., 985 F. Supp. 899, 903 (S.D. Iowa 1997)); Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774 (7th Cir. 2003) (similar); see Abdel v. U.S. Bancorp, 457 F.3d 877, 880 (8th Cir. 2006) ("A cause of action for plan benefits under ERISA accrues when a plan fiduciary has formally denied an applicant's claim for benefits or when there has been a repudiation by the fiduciary which is clear and made known to the beneficiary." (Internal quotation marks and quoted case omitted).

The focus of this action is whether the plan administrator acted improperly in terminating plaintiff's LTD benefits in 2007. The claim for wrongful termination of benefits arose in 2007. Thus, the version of the plan in effect in 2007, the 2005 plan, must be considered in determining the scope of review of the administrator's decisions.

The focus on the plan administrator's decisions in 2007 is also justified based on reference to the nature of the welfare benefit plan at issue. "Though [ERISA] pension plans are subject to mandatory vesting requirements, see 29 U.S.C. § 1053 (1994), [employee] welfare [benefit] plans are not subject to such standards, and employers generally are free to amend or terminate these plans unilaterally." Barker v. Ceridian Corp., 122 F.3d 628, 632-33 (8th Cir. 1997) (internal citations omitted); see Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir. 1990) ("Welfare benefit plans may be modified or terminated absent the employer's contractual agreement to the contrary."), aff'd, 516 U.S. 489 (1996).

Other courts have held that if benefits have not vested, the plan participant does not have an unalterable right to those benefits. "The fact that benefits have not vested suggests that the plan is malleable and the employer is at liberty to change the plan and thus change the benefits to which a participant is entitled." Hackett, 315 F.3d at 774. "Since the employer can change the plan, then

it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues." Id. (citing Grosz-Salomon, 237 F.3d at 1159, as using the same reasoning to reach the same conclusion).

Nothing in the 1986 Policy issued to Quest assured employees that their LTD benefit rights were vested. The policy provided that the plan could be "changed or discontinued with respect to all or any class of employees" without the consent of Quest's employees. Plaintiff does not argue that her rights vested under the 1986 Policy. Because no employees' rights were vested, Quest was free to change its long-term disability plan, which it did in 2004 and 2005. Because plaintiff's cause of action accrued in 2007, this Court must look to the version of the plan then in effect to determine the appropriate standard of review.

Plaintiff argues that de novo review should apply because Quest could not change the policy in 2004 or 2005, as there was no language in the "2000 policy" authorizing Quest to change or terminate the policy. Plaintiff also observes that the "2000 policy" does not contain any discretion-granting language in favor of Aetna. The Court rejects this argument. The "2000 policy" that plaintiff refers to is actually the two Booklets and two Summary of Benefits that Aetna erroneously sent to her former attorney in January 2010, in response to the attorney's request for a copy of the disability insurance policy. These documents did not, however, include or constitute a policy.

The facts show that the 1986 Policy was in effect at the time plaintiff obtained LTD benefits in 2001, and that the 1986 Policy contained language allowing Quest to change or terminate the policy without its employees' consent. Quest did not change the policy in 2000, but did so in 2004 and again in 2005. The 2005 Policy was in effect when Aetna made the decision to terminate plaintiff's LTD benefits, and it is to that policy the Court must look to determine the standard of review.

The 2005 Policy provides that Aetna has discretionary authority in exercising its fiduciary responsibilities as follows: "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy." Based on this language, Aetna clearly had discretionary authority with respect to its decision to terminate plaintiff's benefits and with respect to its handling of plaintiff's appeal. As a result, the Court utilizes an abuse of discretion standard.

## A. **Abuse of Discretion Standard**

"In reviewing for an abuse of discretion, the administrator's decision should be reversed only if it is arbitrary and capricious." Green v. Union Security Ins. Co., 646 F.3d 1042, 1050 (8th Cir. 2011) (quoted case and internal quotation marks omitted). "The administrator's decision should be affirmed if it is reasonable, meaning it is supported by substantial evidence." Id. Substantial evidence is "more than a scintilla but less than a preponderance." Willcox v. Liberty Life Assur. Co. of Boston, 552 F.3d 693, 700 (8th Cir. 2009) (quoted case omitted). Ultimately, "The requirement that the plan administrator's decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." Green, 646 F.3d at 1050 (8th Cir. 2011) (quoted case and internal quotation marks omitted).

### 1. Effect of Conflict of Interest and Procedural Irregularities

In Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105 (2008), the United States Supreme Court concluded that a conflict of interest is present when a plan administrator acts in dual roles as the payor of plan benefits as well as the administrator who decides whether benefits are paid, as does LINA in this case. The Supreme Court declined to hold that such a conflict warrants a less deferential standard of review in all cases, but rather adopted a "combination of factors" method in

which the conflict of interest can act as a "tiebreaker" when the other factors are closely balanced. Id. at 117. A conflict is "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." Id. "In Glenn, the Supreme Court made clear the conflict does not change the standard of review applied by the district court." Hackett v. Standard Ins. Co., 559 F.3d 825, 830 (8th Cir. 2009). Rather, Glenn merely instructs courts to "take account of several different considerations" when evaluating the deference to be afforded a plan administrator's decision, "of which a conflict of interest is one." Glenn, 554 U.S. at 117.

Here, plaintiff cites the Glenn decision and notes Aetna's conflict of interest as the plan administrator and payor of plan benefits, but does not identify any further evidence of a conflict, such as a history of biased claims decisions. The Supreme Court instructed that such a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Glenn, 544 U.S. at 117.

As detailed above in the "Facts" portion of this opinion, it is undisputed that Aetna has taken a number of active steps to reduce potential bias and to promote accuracy in its decision making. Plaintiff has not offered any evidence to show that Aetna's conflict was likely to have affected its benefits decisions, or that it has a history of biased claim decisions. Under the facts of this case, the Court acknowledges the existence of Aetna's conflict of interest but finds the conflict is at or near

the "vanishing point" as described in <u>Glenn</u>. As a result, Aetna's conflict of interest is of little weight here.

Plaintiff also asserts that Aetna committed serious procedural irregularities in this case that warrant amount to a breach of fiduciary duty, such that a heightened standard of review should apply. Plaintiff points to the following mistakes Aetna made in the appeals process of her claim: (1) sending her former attorney documents that were unresponsive to his request for the disability insurance policy, some of which did not even apply to plaintiff, and (2) including the 2004 Policy in the administrative record initially filed in this case, rather than the 2005 Policy, although it did not provide either policy to plaintiff's counsel.

The Court does not excuse Aetna's mistake in responding to the inquiry of plaintiff's former counsel. Also, the docket reflects that the Court required Aetna to file a new motion for summary judgment after uncertainties appeared in the record regarding which policy was applicable to Aetna's decision to terminate plaintiff's LTD benefits. Nonetheless, the two errors plaintiff cites occurred long after the claims decision to terminate plaintiff's LTD benefits was made, and after the appeal of that decision was concluded. In addition, the 2004 Policy and the 2005 Policy are the same in all respects that are relevant to this matter. Plaintiff has not shown any facts to indicate that Aetna's subsequent procedural errors could have had any effect on either the claims decision or the appeal process. As a result, the Court finds these errors do not warrant the application of a heightened standard of review.

**B.  <u>Determination Regarding Plaintiff's Disability</u>**

The Court now turns to the ultimate issue in this case, whether defendant Aetna abused its discretion when it terminated plaintiff's LTD benefits. The Court finds, based on the administrative record that was before Aetna, there was more than a scintilla of evidence supporting Aetna's

decision that plaintiff's medical conditions did not render her "disabled" under the 2005 Policy's any occupation definition. Aetna's decision was supported by substantial evidence, and "a reasonable person *could* have reached a similar decision." See Green, 646 F.3d at 1050.

First, Aetna retained Dr. Gragnani to conduct an independent medical examination ("IME") of the plaintiff and prepare a functional capacity worksheet ("FCW"). Dr. Gragnani's conclusion in the IME that plaintiff was capable of performing sedentary work was based on a thorough review and investigation of plaintiff's physical abilities and conditions, in part as shown on the FCW. The FCW and IME alone constitute more than a scintilla of evidence that plaintiff was not disabled from performing the duties of any occupation under the 2005 Policy. See Green, 646 F.3d at 1051 (quoting Jackson v. Metropolitan Life Ins. Co., 303 F.3d 884, 888 (8th Cir. 2002) (a functional capacity examination "alone constitutes more than a scintilla of evidence" when it concludes a benefits claimant does not meet an ERISA plan's "disability" definition)).

Plaintiff argues that Dr. Gragnani ignored or downplayed many of plaintiff's medical conditions, reviewed only a portion of her medical records, and "did not even follow the instructions that were given to him by Aetna." Pl.'s Amended Mem. Opp. to Mot. Summ. J. at 8. The functional capacity worksheet and the IME show, however, that Dr. Gragnani conducted a thorough examination that distinguished plaintiff's capacities and limitations, he recognized her multiple medical conditions, and he reviewed many more records than plaintiff mentions. Plaintiff fails to cite specific instructions that were allegedly ignored.[4]

---

[4]Plaintiff argues that Dr. Gragnani's IME reveals he did not carefully review her medical records because his functional capacity worksheet called for no exposure limitations, and plaintiff has asthma and Dr. Siddiqui stated she should not be exposed to dust. The Court notes that not all of Dr. Siddiqui's Capabilities and Limitations Worksheets showed this limitation. See AETNA 786, 820. The exposure limitation omission is not significant enough, when compared with the other objective findings made by Dr. Gragnani in the IME and the functional capacity worksheet, to

Second, Aetna's decision was also based on surveillance it conducted of plaintiff as shown on the surveillance video. The Eighth Circuit has stated that "video evidence need not establish conclusively that a benefits claimant can work full time," but instead "provides another form of objective evidence upon which an ERISA plan administrator may base its claims determinations. The use of video surveillance to observe a benefits claimant's condition is reasonable." Green, 646 F.3d at 1052. Aetna's observations of plaintiff over a three-day period performing various activities including repeatedly entering and exiting a vehicle, driving, walking, bending, assisting a child into and out of a vehicle, and carrying bags of items, all with little to no apparent difficulty, constitute evidence supporting its termination of plaintiff's LTD benefits.

Third, as part of its initial review process, Aetna's Vocational Rehabilitation Consultant ("VRC") conducted a labor market analysis, and identified seven sedentary jobs plaintiff could perform, given her work history and her then-current abilities. Each sedentary job identified by the VRC was within a reasonable distance of plaintiff's home and offered wages that met or exceeded plaintiff's reasonable wages under the disability policy. "Transferable skills and labor market studies . . . can constitute substantial evidence supporting a denial of benefits." Green, 646 F.3d at 1052 (cited cases omitted). Based in part on the labor market analysis, Aetna concluded that plaintiff could work in certain sedentary jobs, and this is evidence supporting its decision.

Plaintiff argues that she could not perform any of the jobs identified in the first labor market analysis due to her cognitive defects, because the positions all "require experience with multiple computer programs" and "excellent organizational skills." The record shows, however, that one job

significantly reduce their value as evidence to support Aetna's decision to terminate plaintiff's LTD benefits. Further, the Court notes that none of the jobs listed in either of Aetna's labor market analyses would require plaintiff to work in a dusty environment.

required only "PC experience," four jobs had no computer experience requirement, and four did not require organizational skills. Plaintiff has not shown a fact issue as to whether the identified jobs are not appropriate given Dr. Gragnani's IME and functional capacity worksheet, and the surveillance video.

On September 14, 2007, after receiving Dr. Gragnani's IME and functional capacity worksheet, the video surveillance of plaintiff, and the labor market analysis, Aetna sent a letter to plaintiff's treating physician, Dr. Siddiqui, asking him to review those materials and respond by October 1, 2007 whether he agreed or disagreed with its assessment and conclusion that plaintiff was able to perform the duties of a sedentary occupation on a full-time basis. The letter stated in part, "If you disagree, please provide us with a detailed medical narrative, to include a description/statement of the objective medical information/documentation you base your opinion on, as well as copies of any test results, examination results, etc., you feel would help clarify your position." AETNA 880. Dr. Siddiqui did not respond to Aetna's letter. Although plaintiff objects that Dr. Siddiqui was only given two weeks to respond, he did not respond after that time, either.

On October 1, 2007, Aetna made its determination that plaintiff was no longer disabled within the meaning of the policy. In April 2008, plaintiff appealed the decision and submitted additional information and medical records. Aetna then obtained the medical opinions of five specialist consultants in the areas of neurology, rehabilitation medicine, psychology, pulmonology, and cardiology. Each specialist was provided with extensive medical records of the plaintiff as detailed on their reports, and Dr. Gragnani's IME and FCW. Each of these specialists recognized that plaintiff has multiple medical problems, but concluded she was not disabled from performing any occupation and was capable of performing sedentary work.

Plaintiff objects generally that none of the specialists examined plaintiff, and none "disputed or had issue with Plaintiff's treating physicians and the treatment Plaintiff was receiving." Pl.'s Amended Mem. Opp. to Mot. Summ. J. at 11. There is no requirement that peer reviews be performed by examining physicians, however. Midgett v. Washington Group Int'l Long Term Disability Plan, 561 F.3d 887, 896 (8th Cir. 2009). In addition, plaintiff's assertion that none of the specialists "had issue with" her treating physicians is refuted by the record. For example, neurologist Dr. Cohan stated that treating physician Dr. Siddiqui had submitted several Capabilities and Limitations Worksheets

> in which he states that he considers the claimant disabled, but the physical capabilities described include pushing and lifting capabilities consistent with the performance of at least sedentary work, and it is stated that the claimant can occasionally climb, crawl, kneel, reach above shoulder level, bend, twist, reach forward, and use the hands for grasping and fine manipulations. Thus the physical capabilities described would seem to be contrary to Dr. Siddiqui's statement that he considers the claimant to be permanently and totally disabled.

AETNA 1632. Dr. Cohan took issue with other aspects of Dr. Siddiqui's findings and conclusions:

> Dr. Siddiqui submits correspondence in which he states that the claimant is unable to work due to multiple problems including her postop status regarding the pituitary tumor, her visual status, and her chronic back pain. It has been previously reported that the claimant's postop pituitary status would not preclude work as there is no significant residual defect, and the claimant's visual acuity and peripheral visual field examinations are quite adequate for work. Dr. Siddiqui states that the claimant has radiculopathy, but there is no objective evidence by physical exam findings or electrodiagnostic testing to substantiate the diagnosis of radiculopathy. . . .

> Although Dr. Siddiqui states that the claimant has experienced transient ischemic attacks, nonetheless there is no such history described, and previous carotid Doppler and ultrasound studies revealed nonsurgical stenonis which was stable. The electromyogram and nerve conduction study which was performed April 14, 2008, revealed no electrodiagnostic evidence of neuropathy or radiculopathy.

AETNA 1633.

Dr. Cohan's report concluded, "It is my opinion that the restrictions recommended by Dr. Malik and by Dr. Siddiqui are not substantiated by the medical records provided for review." AETNA 1635.

In addition, psychologist consultant Dr. Burstein observed that Dr. Siddiqui referenced plaintiff's complaints of depression and impairments in her psychological functioning, but failed to provide any examples of plaintiff's behavior or measurements of her cognitive functioning to support his impressions or the presence of impairments. AETNA 1646. Plaintiff's general objections to the consulting physicians are therefore without merit.

Plaintiff also asserts that each specialist's report is flawed and cannot be considered substantial evidence to support Aetna's termination of her LTD benefits. Plaintiff argues that the opinions of Dr. Pianko, the cardiology consultant, who found that plaintiff was stable from a cardiac standpoint and able to work, were in direct contradiction to Dr. Siddiqui's findings and opinions, and that Dr. Pianko erroneously stated plaintiff had no congestive heart failure.

The Eighth Circuit has held "that a plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial." Midgett, 561 F.3d at 897. ERISA does not require plan administrators to give special deference to a plaintiff's treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 834. At the same time, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id.

With respect to Dr. Pianko's opinions, plaintiff does not challenge his assessments regarding plaintiff's mitral valve prolapse, mitral regurgitation, palpitation history, and lack of evidence of valve dysfunction and significant arrhythmia. Although plaintiff's counsel wrote a post-appeal letter to Aetna challenging various aspects of Dr. Pianko's opinions, he did not refer to the absence of a finding of congestive heart failure. As Aetna observes, a different consultant, the pulmonologist, was expected to and did address the one test that indicated plaintiff has congestive heart failure. In addition, Dr. Pianko's report states that he spoke with Dr. Siddiqui on June 17, 2008, and that Dr. Siddiqui "feels her condition is stable from a cardiac perspective . . . . Dr. Siddiqui feels she can perform a sedentary job without much difficulty. This was from the period of 10/1/07 through present." AETNA1619.[5]

Thus, based on the record that was before Aetna at the time of its decision to uphold the termination of LTD benefits, Dr. Pianko's report appeared to be consistent with the opinion of plaintiff's treating cardiologist. Moreover, even if the cardiologists' reports were conflicting, it was

---

[5]Although plaintiff disputes that the Pianko-Siddiqui conversation took place, she offers no admissible evidence to support her assertion. The undated document titled "Affidavit of Jawed Siddiqui, M.D." (Doc. 79-2) is neither an affidavit nor a declaration signed under penalty of perjury. "An affidavit, by definition, is 'a statement reduced to writing and the truth of which is *sworn* to before someone who is authorized to administer an oath.'" Elder-Keep v. Aksamit, 460 F.3d 979, 984 (8th Cir. 2006) (quoting Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985) (emphasis added)). The statement from Dr. Siddiqui lacks signature and attestation before a notary public. Thus, the statement is not an affidavit. Further, while 28 U.S.C. § 1746 permits a person to prepare an unsworn declaration which can be the equivalent of an affidavit, such a document must include a declaration which provides that the signer declares, under penalty of perjury, that the foregoing is true and correct. 28 U.S.C. § 1746. There is no such declaration on the Siddiqui statement. As a result, it is unsworn, and Aetna's request that it be stricken and not considered on summary judgment is granted. See Elder-Keep, 460 F.3d at 984 (district court may properly reject unsworn documents).

Further, even if plaintiff had admissible testimony from Dr. Siddiqui that he did not have a conversation with Dr. Pianko, it would not call into question the reasonableness of Aetna's prior reliance on Dr. Pianko's report of a June 24, 2008 call to Dr. Siddiqui.

not unreasonable for Aetna to credit Dr. Pianko's report over the conclusory reports of Dr. Siddiqui, particularly where Dr. Pianko reported that Dr. Siddiqui agreed plaintiff could perform sedentary work. Aetna was not required to give special deference to Dr. Siddiqui's opinion, and was free to deny benefits based on Dr. Pianko's report, as there is no indication the record does not support the denial.

Plaintiff also challenges the opinion of rehabilitation medicine consultant Dr. Goldman that plaintiff was capable of working a sedentary job. Dr. Goldman reviewed numerous medical records, x-rays, and an MRI, with particular focus on plaintiff's lower back pain, and concluded that none of plaintiff's conditions, including disk bulging and degenerative changes, "would preclude at least sedentary vocational activities." AETNA1626. Dr. Goldman's report also states that on June 19, 2008, he spoke with treating physician Dr. Samudrala, who "stated that the claimant should be capable of performing at least sedentary work as there are no specific neurologic or orthopedic impairments that would preclude at least sedentary exertional work." Id.

Plaintiff argues that Dr. Samudrala's records indicate plaintiff had been diagnosed with bulging discs and degenerative joint changes, and nothing in those records indicate that Dr. Samudrala believes plaintiff is capable of sedentary work. As stated above, however, Aetna has the discretion to "deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial." Midgett, 561 F.3d at 897. Here, Dr. Goldman reviewed the relevant records, acknowledged plaintiff's various back and joint conditions, and concluded that plaintiff could perform sedentary work. Because the treating rehabilitation physician, Dr. Samudrala, agreed with this conclusion, there is no conflicting opinion other than the unsupported argument of plaintiff's counsel.

Plaintiff argues that the opinion of Dr. Cohan, the neurologist, is "not reasonable and makes no sense," because he acknowledges that plaintiff was diagnosed with a moderate cognitive defect but then concluded "there would be no other neurologic impairment for performance of a sedentary job." Plaintiff accurately quotes Dr. Cohan's report but fails to convey its meaning.

Dr. Siddiqui sent plaintiff to consult with neurologist Dr. Maheen Malik on October 30, 2007, shortly after Aetna had terminated her LTD benefits. See AETNA1255-58. Based on the consult, Dr. Malik concluded that plaintiff had a moderate cognitive deficit which "appeared to be clearly declined from her baseline as suggested by her previous occupation." AETNA1258. Although Dr. Malik saw plaintiff shortly after her disability benefits had been terminated, she did not offer an opinion as to whether plaintiff could perform sedentary work. See AETNA1258; cf. AETNA1648 (where Dr. Burstein concludes plaintiff's apparent cognitive issues pose no barrier to sedentary work).

When Dr. Cohan contacted Dr. Malik eight months after the consult, plaintiff had seen Dr. Malik only once more and her condition was unchanged. Dr. Cohan asked Dr. Malik if plaintiff's cognitive function results were reliable and consistent, and did not demonstrate the possibility that plaintiff was providing "suboptimal effort" during the consult. Dr. Malik responded that she could not determine plaintiff's cognitive function objectively without formal neuropsychological testing, and that she would recommend to plaintiff that she undergo such testing. See AETNA1633.

Dr. Cohen concluded that plaintiff's medical records "do not describe significant cognitive dysfunction other than the records submitted by Dr. Malik. These reported cognitive problems cannot be substantiated in the absence of formal neuropsychological testing, and there is no uniform consistency amongst the medical providers whose records were reviewed to substantiate that claimant has significant cognitive deficit." Based on these observations and conclusions, Dr.

Cohan's statement that "[t]here would be no other neurologic impairment for performance of a sedentary job," means that apart from any objectively-diagnosed significant cognitive deficit, plaintiff had no other neurological impairments that would affect her ability to work. Dr. Cohan ultimately concluded, "The documentation submitted, including the information obtained telephonically today from Dr. Malik is not indicative of a functional impairment for 'any occupation' from October, 2007." AETNA1634.

The Court finds that Dr. Cohan's report was substantial evidence on which Aetna could rely in deciding to terminate plaintiff's LTD benefits, because it was based on Dr. Cohan's perception of a lack of consistency in plaintiff's medical records concerning her cognitive problems, and the lack of objective neuropsychological test results to support Dr. Malik's conclusions concerning plaintiff's cognitive function. As stated above, Aetna had the discretion to "deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial." Midgett, 561 F.3d at 897.

Plaintiff argues that the opinion of pulmonologist Dr. Mazal is "ridiculous and worthless" because he discounted an objective finding from a pulmonary function test showing "clearly abnormal" results, cited normal non-pulmonary-related lab values which are irrelevant to plaintiff's pulmonary status, and "states that dyspnea should be apparent from afar on a surveillance video."[6] Pl.'s Amended Mem. Opp. to Mot. Summ. J. at 13.

Dr. Mazal's report indicates that he recognized Dr. Siddiqui gave plaintiff a pulmonary function test that came back with "clearly abnormal" results of a forced vital capacity of 50% and

_____

[6]Dyspnea is defined as, "Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Stedman's Medical Dictionary 556 (27th ed. 2000).

an FEV1 at 17%, but Dr. Mazal discounted that test as aberrant because "there was no documentation that the results were reproducible and the oxygen saturation level on that day was normal at 96%" and "[t]here has been no documentation of recent or recurring hospitalization or emergency department visits due to respiratory failure." AETNA1640.

Although plaintiff criticizes these findings, she does not offer any evidence that Dr. Mazal was mistaken in his opinions and observations, specifically that the "clearly abnormal" pulmonary function test results were aberrant because if they were correct, plaintiff should not have had a 96% oxygen saturation level and would likely have been visiting the emergency room or hospital due to respiratory failure. Further, Dr. Mazal's report does not state that dyspnea "should be apparent from afar" on a surveillance video as plaintiff states. Rather, Dr. Mazal observes that the video shows plaintiff "getting in and out of her automobile and driving to various stores and carrying packages," and states, "There was no obvious demonstration of dyspnea noted." AETNA1639. Plaintiff's criticism that Dr. Mazal discussed irrelevant, normal lab values fails to recognize that the lab values were relevant to the separate opinion he offered concerning the possibility of diabetes precluding plaintiff from working a sedentary, full-time job. AETNA 1640.

Dr. Mazal's report therefore offers a basis for his conflicting opinion with treating physician Dr. Siddiqui, and casts doubt on the reliability of the pulmonary function test performed by Dr. Siddiqui. Plaintiff fails to offer any other evidence tending to establish that the pulmonary function test was accurate and not an aberration, such as that plaintiff ever had another pulmonary function test. Aetna had the discretion to accept Dr. Mazal's pulmonology report and opinion over Dr. Siddiqui's opinion, see Midgett, 561 F.3d at 897, and the report provides substantial evidence to support the termination of plaintiff's LTD benefits.

With respect to psychologist Dr. Burstein's report, which stated that moderate cognitive deficits would not prevent plaintiff from working as long as she could "use a calculator and be able to write things down," plaintiff states, "At the very least Dr. Burstein is stating that accommodations would have to be made in order for Plaintiff to return to work, although other consultants have stated that accommodations were not necessary."

Plaintiff therefore does not actually challenge Dr. Burstein's report. but rather appears to be attempting to use his conclusion to challenge the other consulting specialists because they did not also state that plaintiff needed accommodations in order to perform sedentary, full-time work. Plaintiff does not claim, however, that any other consulting specialist was asked to determine how to accommodate her cognitive deficits, or explain why they should have been asked to do so. In addition, it is undisputed that the accommodations noted by Dr. Burstein were used in Aetna's second labor market analysis.

Here, the record shows that Aetna considered the medical records of plaintiff's treating physicians in addition to those of its consultants. Aetna was not required by ERISA to give special deference to plaintiff's treating physicians' opinions, and did not abuse its discretion in accepting its consulting physicians' conflicting opinions in those instances where the opinions actually conflicted. Further, the Eighth Circuit has held that where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled. See Delta Family-Care Disability and Survivorship Plan v. Marshall, 258 F.3d 834, 843 (8th Cir. 2001).

Finally, after obtaining the five consulting physicians' reports, Aetna obtained a second labor market analysis (the "Labor Market Survey") to determine whether plaintiff was capable, given her education, experience, physical restrictions and training, of working in any occupation within a

reasonable distance of her home that paid a reasonable wage. The Labor Market Survey identified three sedentary occupations plaintiff was capable of performing--cashier, ticket taker/seller, and information clerk/greeter--and seven jobs. Of these seven jobs, six of the employers stated the positions were sedentary, repetitive occupations that fell within plaintiff's physical restrictions, while one of the positions was not. <u>See</u> AETNA1656.

Plaintiff objects that only five of the jobs have openings, one requires frequent standing and lifting of over twenty pounds, and five involve handling monetary transactions. However, the job that was not consistent with plaintiff's physical limitations was so noted by the labor market analyst, and plaintiff offers no evidence to support her conclusion that the remaining six jobs positions, four of which had openings at the time of the analysis, were unsuitable. Plaintiff also does not offer any evidence to contradict Dr. Burstein's conclusion that plaintiff's mathematical and memory deficits can be accommodated through use of a calculator and by writing things down. <u>See</u> AETNA1648. The Labor Market Survey is therefore substantial evidence that supports Aetna's decision to terminate plaintiff's LTD benefits. <u>See</u> <u>Green</u>, 646 F.3d at 1052 ("[L]abor market studies . . . can constitute substantial evidence supporting a denial of benefits.").

## IV. Conclusion

Plaintiff suffers from a number of health conditions, and reasonable minds could differ, based on the record, as to how those conditions affect her. This Court's "duty is to determine whether [Aetna's] decision was supported by substantial evidence, not to weigh the evidence anew." <u>See</u> <u>Green</u>, 646 F.3d at 1053. Based on the record as a whole, the Court concludes that substantial evidence supports Aetna's decision to terminate plaintiff's long-term disability benefits, and "a reasonable person *could* have reached a similar decision." <u>See</u> <u>Green</u>, 646 F.3d at 1050. As a result, Aetna did not abuse its discretion in terminating plaintiff's long-term disability benefits on the basis

that she was no longer "disabled" as that term is defined in the 2005 Policy. The Court will therefore grant Aetna's motion for summary judgment on plaintiff's ERISA claims, and deny plaintiff's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Aetna Life Insurance Company's motion for summary judgment is **GRANTED**. [Doc. 75]

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment is **DENIED**. [Doc. 78]

An appropriate judgment will accompany this Memorandum and Order.


 

 

 

_____

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this _ 19th _ day of September, 2011.